**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 07a0232n.06
Filed: March 28, 2007

**No. 06-5553**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

LISA THOMPSON, Administratix of the Estate
of Edna Lee, deceased,

     **Plaintiff,**

v.                              **ON APPEAL FROM THE UNITED
                                         STATES DISTRICT COURT FOR THE**

WILLIAM J. HENDERSON, Postmaster  **WESTERN DISTRICT OF KENTUCKY**
General,

     **Defendant.**

_____/

**BEFORE:    KENNEDY, BATCHELDER and CLAY, Circuit Judges.**

     **CLAY, Circuit Judge.** Plaintiff Lisa Thompson ("Thompson"), the administratrix of the

estate of Edna Lee ("Lee"), a former postal worker, appeals the district court's grant of summary

judgment in favor of Defendant, William J. Henderson, Postmaster General, in this employment

discrimination action filed under 28 U.S.C. §§ 1331, 1343 and 2201; Title VII of the Civil Rights

Act of 1964, 42 U.S.C. § 2000e, *et. seq.*; the Rehabilitation Act of 1973, 29 U.S.C. § 791, *et seq.*;

and the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et. seq.* For the following reasons,

we **AFFIRM** the district court's decision.

**BACKGROUND**

Lee, an African-American woman, was employed by the U.S. Postal Service in Louisville, Kentucky on September 1, 1984, "as a casual employee," (J.A. 188), and later "converted to a career status," *id.*, as a Flat Sorter Machine Operator ("FSMO"). This position essentially involves three functions: loading mail into a machine; keying in address codes; and sweeping or unloading mail. The machine is operated by a crew of employees who rotated among the three different tasks.

Since approximately 1987, Lee suffered from back problems associated with "degenerative disk disease." (J.A. 194) She had back surgery in 1988, and "subsequently filed a [workers' compensation claim] alleging that her employment had adversely affected her back. The claim was denied." (J.A. 194) "In 1991, Lee filed a workers' compensation claim which was accepted by the Department of Labor, Office of Workers Compensation Programs, for an ankle sprain." (J.A. 13) In 1992, Lee sustained a work-related injury to her back. She filed a new workers' compensation claim for this injury, which was accepted by the Department of Labor, Office of Workers Compensation Programs, on July 20, 1992. On October 12, 1993, this claim was closed. However, before the 1992 workers' compensation claim was closed, Lee filed a new claim based on an injury she sustained in January 1993. Lee's 1993 workers' compensation claim was denied on February 8, 1995.

Defendant provides "limited-duty" positions to employees with work-related injuries, while "light-duty" positions are provided to employees with injuries that are not work-related. (J.A. 80) Because she reported a work-related injury, Defendant was required to offer Lee a "temporary limited-duty assignment," (J.A. 72), under the terms of the collective bargaining agreement which

governed Lee's employment. Lee was offered a temporary limited-duty assignment with specified restrictions on lifting and carrying limited to fifteen pounds, no prolonged bending, and no prolonged twisting. The type of work which Lee performed during her temporary limited-duty assignment is unclear. Initially, her position appears to have involved "casing regular mail in a manual case." (J.A. 73) The record indicates that "some of the work [Lee performed], such as [her] tenure on the label machine, was simply an attempt to find something for her to do[,] while at other times, such as when she worked as a manual sorter, she may actually have been filling a position." (J.A. 214) Indeed, "there is insufficient information in the record to establish that [Lee] had been performing the essential functions of a position or a number of positions between mid 1991 and early 1995; instead of doing whatever work Management may have cobbled together to keep her busy." (J.A. 214) Regardless of the nature of her work, it is clear that Lee held a limited-duty assignment, and did not work as a FSMO, from 1992 to March 1995.

Since Lee's workers' compensation claims were all resolved by February 8, 1995, she no longer qualified for her limited-duty assignment. On March 7, 1995, and March 16, 1995, Lee submitted requests for "temporary light duty assignment" based on her non-work-related back problems. (J.A. 83; 141-45) Defendant offered Lee a temporary light-duty assignment, in accordance with the restrictions specified by her physician. The supervisor who authorized her request wrote on the request form that: "This is Temporary <u>Light</u> Duty; not Permanent Limited Duty." (J.A. 141) (emphasis in original).

In March 1995, Lee also discussed employment options with Defendant's personnel office. The personnel office found that

3

> [g]iven her permanent medical restrictions, it did not appear possible for her to perform the essential functions of most jobs for which she might be qualified, with or without reasonable accommodation. It appeared that she might be able to perform a MUM (Misaddressed/Unaddressed Mail) or CFS Clerk job.

(J.A. 178) However, "to qualify for either of these jobs, she needed to pass a typing test. . . . [and] even if she did qualify, she would not be able to get a job unless she was the senior qualified bidder," (J.A. 178), under the terms of the collective bargaining agreement. Lee did not qualify or bid for these positions.

Lee started training for the MUM clerk position, but ceased training because she was allegedly informed that the position had a lifting requirement which could not be waived. Defendant concedes that the "lifting requirement for the MUM or CFS clerk job [ ] exceeds [ ] Lee's restriction of 15 lbs." (J.A. 178) However, Defendant argues that it "could accommodate [Lee] in this regard, which is why [personnel] encouraged her to bid for such a position." *Id.* Defendant maintains that "if [Lee] was the senior qualified bidder, accommodations would be considered at that time." *Id.*

In August 1995, Linda Ann Altic, ("Altic"), one of Lee's supervisors, "did not feel [Lee's] light duty restrictions and her light duty assignment, were well matched." (J.A. 226) Lee continuously "report[ed] to work late," (J.A. 227); "was not productive," (J.A. 228); and was visibly "in pain." *Id.* "Her attitude was one of wanting to do the job, but she was not able to do the job." *Id.* In light of her work performance and physical condition, "the decision was made to put her in for [a] Fitness For Duty" examination. *Id.* On August 24, 1995, Altic requested that Lee be scheduled for "a Fitness for Duty physical" examination noting that "Lee's statement for temporary

4

light duty stated that her disability is permanent," and "[s]he is unable to perform the duties of her bid position." (J.A. 183)

Altic affirms that the "main reason for putting [Lee] in for the fitness for duty was that she was a hazard to herself as well as to the Postal Service," (J.A. 230), based on "the fact, [that] she was falling [sic] asleep and sometimes in a dazed condition, and I would often find her with her feet up on the ledge of the case. And safety procedures on the workfloor are that you always have one foot on the floor." *Id.* "[Altic] felt [she] had a responsibility to the Postal Service to report this unsafe practice, as well as a responsibility to [Lee] to see that she was not put in a position where she was likely to sustain an injury." (J.A. 231) Altic asserts that the "goal of the fitness for duty was to get a better alignment of her capabilities under her medical restrictions to her actual assigned [sic] job duties." *Id.*

Lee's fitness-for-duty physical examination was scheduled for September 22, 1995. (J.A. 160) The examination results revealed that she had lifting and carrying limitations and that "she [was] not medically fit to perform all the essential functions of her [ ] position." (J.A. 185) The physician who conducted the examination noted that "[t]he severity of [Lee's lifting and carrying] restrictions are very arbitrary but do restrict her from normal functions of" her position. (J.A. 186) In light of the examination results, Lee met again with personnel in September 1995. "Two union representatives accompanied her at the meeting." (J.A. 97-98; 178) "It again appeared that the MUM or CFS clerk jobs were the best options for her. At that time, however, she still had not passed the typing test to qualify for those jobs. In addition, [personnel] was not aware of any vacancies in those positions." (J.A. 178) Lee did not qualify or bid for any position.

On October 6, 1995, Lee requested a permanent light-duty position. On October 23, 1995, she was informed that "[t]here are no permanent light duty positions in the Louisville Plant." (J.A. 147) Although the record is unclear, it appears that Lee renewed her request to be assigned to a permanent light-duty position several times. Lee's additional requests appear to have been similarly denied. On November 16, 1995, Defendant sent Lee "a letter giving [her] information on disability retirement." (J.A. 189)

On January 22, 1996, Lee received a notice of removal which "charged [her] with being medically restricted from safely performing the essential duties of a Flat Sorter Operator." (J.A. 188-91) Lee challenged her termination through the grievance and arbitration procedure set forth in her collective bargaining agreement. She was represented by her union at a hearing held on October 10, 1996. On November 18, 1996, an arbitrator denied the grievance finding that Defendant properly removed Lee. The arbitrator found that "[t]he overriding conclusion from all of the medical evidence in the record is that there was no position for which [Lee] could meet the essential qualifications even with reasonable accommodation. Because there was not, [Defendant] had a right to discharge her." (J.A. 217) After her removal, Lee applied for disability retirement and her application was approved on October 16, 1997.

On April 25, 2002, Lee filed a complaint in the U.S. District Court for the Western District of Kentucky, under 28 U.S.C. §§ 1331, 1343 and 2201; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et. seq.*; the Rehabilitation Act of 1973, 29 U.S.C. § 791, *et seq.*; and the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et. seq.*, alleging employment discrimination and wrongful termination on the basis of race, age, sex and disability against Defendant. On January

29, 2004, as a result of Lee's death and Thompson's appointment as administratrix of Lee's estate, Plaintiff's counsel filed a motion for leave to file an amended complaint. On February 13, 2004, the district court granted counsel's motion, and an amended complaint was filed on February 20, 2004. On August 1, 2005, Defendant filed a motion for summary judgment pursuant to Fed. R. Civ. P. 56(b) and (c). The district court granted Defendant's motion on March 21, 2006. On April 13, 2006, Plaintiff filed a notice of appeal to this Court. It is important to note that Plaintiff's brief to this Court addresses only her disability and racial discrimination claims. Thus, Plaintiff appears to have abandoned the sex and age discrimination claims which were raised in the district court.

## DISCUSSION

### I. Standard of Review

This Court reviews a district court's grant of summary judgment *de novo*. *Dickerson v. McClellan*, 101 F.3d 1151, 1157 (6th Cir. 1996). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "A fact is material and precludes grant of summary judgment if proof of that fact would have effect of establishing or refuting one of essential elements of a cause of action or defense asserted by the parties, and would necessarily affect application of appropriate principle of law to the rights and obligations of the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (internal quotation marks and citation omitted).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 332-33 (1986). If Defendant carries its burden of showing that there is an absence of evidence to support a claim, *id.* at 325, plaintiff must come forward with "specific facts showing that there is a genuine issue for trial," *First Nat'l Bank of Ariz. v. Cities Servs. Co.*, 391 U.S. 253, 270 (1968) (internal quotation marks and citation omitted); *see also Ashbrook v. Block*, 917 F.2d 918, 921 (6th Cir. 1990).

## II.     Plaintiff's Disability Discrimination Claim

### A.     The Legal Framework

Plaintiff alleges that Defendant violated the Rehabilitation Act of 1973, 29 U.S.C. §§ 791-96, by failing to reasonably accommodate Lee's alleged disability. "Although the Rehabilitation Act predates the Americans with Disabilities Act [ ], 42 U.S.C. § 12101 *et seq.,* analyses of claims made under the two acts run roughly parallel." *Mahon v. Crowell*, 295 F.3d 585, 588-89 (6th Cir. 2002). "[B]y statute, the Americans with Disabilities Act standards apply in Rehabilitation Act cases alleging employment discrimination." *McPherson v. Michigan High Sch. Athletic Ass'n*, 119 F.3d 453, 460 (6th Cir.1997) (internal quotation marks and citations omitted); *see* 29 U.S.C. § 794(d) (providing that complaints of disability discrimination under the Rehabilitation Act are governed by the standards under Title I of the Americans with Disabilities Act). "Because the standards under both [ ] acts are largely the same, cases construing one statute are instructive in construing the other." *Andrews v. Ohio*, 104 F.3d 803, 807 (6th Cir. 1997); *see also Smith v. Henderson*, 376 F.3d 529, 534 (6th Cir. 2004).

The Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*., provides that "[n]o

covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a); *see also Todd v. City of Cincinnati*, 436 F.3d 635, 636 (6th Cir. 2006); *Moorer v. Baptist Mem'l Health Care Sys.*, 398 F.3d 469, 479 (6th Cir. 2005); *Hedrick v. Western Reserve Care Sys.*, 355 F.3d 444, 452 (6th Cir. 2004).

Under the ADA, a "qualified individual with a disability [is] an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Moorer*, 398 F.3d at 479 (internal quotation marks and citation omitted). "Under the ADA, a 'disability' means either (1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment." *Id*. (citing 42 U.S.C. § 12102(2)).

The ADA defines "major life activity [as] 'functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.'" *Moorer*, 398 F.3d at 479 (quoting 29 C.F.R. § 1630.2(i)). "The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3)(i). Indeed, "plaintiffs [must] allege [that] they are unable to work in a broad class of jobs or a broad range of jobs in various classes." *Moorer*, 398 F.3d at 479 (internal quotation marks and citation omitted). "An employer must make 'reasonable accommodations to the known physical

9

or mental limitations of an otherwise qualified individual with a disability.'" *Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 249 (6th Cir. 2004) (quoting 42 U.S.C. § 12112(b)(5)(A)).

To successfully establish a *prima facie* case of disability discrimination under the ADA, a plaintiff must establish that: "1) he is an individual with a disability; 2) he is otherwise qualified to perform the job requirements, with or without reasonable accommodation; and 3) he was [not hired] solely by reason of his handicap." *Hedrick*, 355 F.3d at 452 (alteration in original) (internal quotation marks and citation omitted). "A plaintiff may prove that he was discriminated against based upon his disability either through direct or indirect evidence." *Id.*

If a plaintiff presents direct evidence of disability discrimination,

> (1) The plaintiff bears the burden of establishing that he or she is disabled. (2) The plaintiff bears the burden of establishing that he or she is "otherwise qualified" for the position despite his or her disability: (a) without accommodation from the employer; (b) with an alleged "essential" job requirement eliminated; or (c) with a proposed reasonable accommodation. (3) The employer will bear the burden of proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon the employer.

*Hedrick*, 355 F.3d at 452 (citation omitted). If a plaintiff seeks to establish a case indirectly, a burden-shifting approach applies so that the

> plaintiff may establish a *prima facie* case of discrimination by showing that: (1) he or she is disabled; (2) otherwise qualified for the position, with or without reasonable accommodation; (3) suffered an adverse employment decision; (4) the employer knew or had reason to know of the plaintiff's disability; and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced. The defendant must then offer a legitimate explanation for its action. If the defendant satisfies this burden of production, the plaintiff must introduce evidence showing that the

> proffered explanation is pretextual. Under this scheme, the plaintiff retains the ultimate burden of persuasion at all times.

*Id.* at 452-53 (citation omitted); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). An adverse employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). Moreover, the Supreme Court has clarified that the elements necessary for the *prima facie* case are flexible because "[t]he facts necessarily will vary in Title VII cases, and the specification [ ] of the prima facie proof required . . . is not necessarily applicable in every respect to differing factual situations." *McDonnell Douglas*, 411 U.S. at 802 n.13.

## B. The District Court Properly Dismissed Plaintiff's Disability Discrimination Claim

In the instant case, the sole issue before the Court is whether Plaintiff has proffered sufficient evidence to create a genuine issue of material fact that she suffered an adverse employment action. In the cursory appellate brief, Plaintiff appears to argue that Defendant a) failed to provide a reasonable accommodation for Lee's alleged disability; b) unnecessarily and unfairly subjected Lee to a fitness-for-duty physical examination; and c) removed Lee as a result of discrimination. Plaintiff's arguments are meritless. Each argument will be addressed below.

### 1. Reasonable Accommodation

Plaintiff argues that Defendant failed to reasonably accommodate her alleged disability. For its part, Defendant maintains that the "record establish[es] only that Lee had a history of back problems which rendered her incapable of performing her assigned job." (Def. Br. at 12) The record

indicates that Lee was unable to perform duties associated with her position because of her physical condition:

| | |
|---|---|
| Question: | So, given the restrictions that you're under on this document . . . you could not do your regular flat sorter operator job.  Right? |
| Answer: | No, because the weight restrictions vary.  You may lift up to 100 pounds, 90 pounds, two pounds.  There is no significance on the weight when you're working on that machine. |

(J.A. 75-76) (formatting added).  Lee's physical condition rendered her unable to perform her work.

This conclusion is confirmed by the results of Lee's fitness-for-duty physical examination, which revealed that she had lifting and carrying limitations and that "she [was] not medically fit to perform all the essential functions of her [ ] position." (J.A. 185)  More specifically, Lee conceded that she could not perform essential functions of her position:

| | |
|---|---|
| Question: | . . . I'm just asking if you know of anything . . . that the postal service could have done that would have enabled you to perform the flat sorter job.  Do you understand? |
| Answer. | I understand what you're talking about.  I had the rest bar; I had the special chair that was in the manual.  The only thing they could have done -- see, in a bargaining thing like that, you're going to have conflict with the other employees.<br><br>    Now, I could have loaded ledges; I could just key.  But, see, that's not the issue.  You've got to complete -- be able to complete your task, you know.<br><br>    In other words, after I keyed, I was supposed to be pulling boxes, break the machine down, and roll them A.P.C.'s out to dispatch.  I couldn't have did that – |
| . . . | |
| Question: | -- You could do the keying part of the job, but the other parts required carrying, lifting, bending, that you could not do? |

12

Answer:       Right.

(J.A. 78-79) (formatting added).   As illustrated above, Lee simply could not identify an accommodation that would have enabled her to perform her job.  Therefore, it is an undisputed, material fact that Lee could not perform the essential functions of her job, with or without accommodations.

To recover under the ADA, a plaintiff

> must also establish that he is a "qualified individual with a disability" by showing: (1) that he "satisfies the prerequisites for the position [he holds or desires], such as possessing the appropriate educational background, employment experience, [and] skills . . ."; and (2) that he "can perform the essential functions of the position held or desired, with or without reasonable accommodation."

*Burns v. Coca-Cola Enter., Inc.*, 222 F.3d 247, 256 (6th Cir. 2000) (quoting *Dalton v. Subaru-Isuzu Auto., Inc.,* 141 F.3d 667, 676 (7th Cir.1998)) (alterations in original).  Under the ADA, a "qualified individual with a disability [is] an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Moorer*, 398 F.3d at 479 (internal quotation marks and citation omitted).  In the instant case, the record clearly indicates that Lee could not perform her job.  Plaintiff has failed to proffer any evidence to support the contention that Lee could perform the essential functions of her position.  Because Lee could not perform essential functions of the position for which she was hired, with or without accommodation, the district court properly dismissed this claim.

Plaintiff contends that Lee could have continued in the various jobs to which she had been assigned while on limited-duty for her work-related injury, or while on temporary light-duty for which she was later approved.  This argument is unpersuasive.  Under the collective bargaining

13

agreement which governed Lee's employment, Defendant had an obligation to provide Lee with a limited-duty position while her workers' compensation claims for work-related injuries were pending before the Department of Labor. When Lee's workers' compensation status expired, Defendant had no obligation to maintain Lee on limited-duty assignments. Nevertheless, Defendant allowed Lee to remain in a temporary light-duty position, based on her non-work-related back injury, for a period of time. Lee's request for temporary light-duty assignment indicates that: "This is Temporary Light Duty; not Permanent Limited Duty." (J.A. 141) (emphasis in original).

Temporary light-duty assignments, which are provided to employees with non-work-related injuries, are governed by a collective bargaining agreement. "The [collective bargaining] agreement is clear [ ] that although the post office may grant temporary light duty status to an employee experiencing illness or injury, an employee must go through the proper application and bidding procedure for an assignment to permanent light duty status." *Hurst v. United States Postal Serv.*, 653 F. Supp. 259, 263 n.2 (N.D. Ga. 1986). Lee's "limited and light duty assignments were not bid jobs." (Def. Br. at 14) Lee requested a permanent light-duty position, but "there [were] no permanent light duty positions in the Louisville Plant." (J.A. 147) Lee did not take the typing test required for the MUM or CFS clerk positions; failed to complete the MUM Clerk training; did not bid for a permanent position, and did not otherwise pursue other employment opportunities with Defendant. The record also indicates that Lee's physical condition was permanent. The permanence of her condition is evidenced by Lee's successful application for permanent disability retirement benefits. (J.A. 219-22) Defendant is simply not required to engage Lee in temporary light-duty assignment in perpetuity. "[T]he ADA does not compel an employer to convert temporary positions

14

it has set aside into permanent positions for its disabled employees." *Hoskins v. Oakland County Sheriff's Dep't*, 227 F.3d 719, 730 (6th Cir. 2000).

Nevertheless, Lee indicated that Defendant "can make a light-duty job out of anything, any position, if they want to. Because they have." (J.A. 101) More specifically, Lee stated:

> Answer: A guy that he had had surgery on his hand, and he went around -- arm or something -- went around taking inventory on trucks. Had a clipboard going around and taking inventory.
>
> Question: And, that was his permanent job?
>
> . . .
>
> Answer: I don't know if it was a bid job or not, but it was a job he had.
>
> . . .
>
> Answer: There was another lady [Patricia Sauer] where she had -- and its hereditary, I can't think of the name of it -- anyhow, her bones were deteriorating from her neck on down. By her keying on the L.S.M. machines, it aggravated it worse, and they put her in a letter house, and they left her there. I asked her, are you going to have surgery? She said, no, because my bone structure is not sound. Surgery won't help her. . . . And, they left her in that job. . . . until she got her disability, and she got disability.
>
> Question: And, then she retired?
>
> Answer: Yes.

(J.A. 102-04) (formatting added). Lee argues that Defendant has created positions for other disabled people. "It is well established, however, that an employer is not obligated to create a position not then in existence." *Hoskins*, 227 F.3d at 729. Plaintiff has failed to show that Lee was entitled to a permanent light-duty position, and has failed to proffer evidence that there was a vacant position which Lee could fill. Lee was notified that there were no positions available with which to accommodate her condition. Lee's contention that other employees had a light-duty job created for

15

them is not supported by any evidence in the record.  At least with respect to Patricia Sauer ("Sauer"), the record indicates that:

> Sauer was a Letter Sorting Machine (LSM) Operator who suffered from a condition that rendered her unable to perform that job. Although she was provided with light duty for a period of time, her request for permanent light duty was denied.  Ms. Sauer later was able to return to work, however, because she qualified for, and was the successful bidder on, a MUM clerk position.  She later applied for, and was granted, disability retirement.

(J.A. 179).  As illustrated above, at least one other disabled employee was also denied permanent light-duty assignments.  (J.A. 181)

Lee's right to a light-duty position under the collective bargaining agreement was litigated by the union on her behalf through the grievance and arbitration procedure.  The arbitrator concluded that Lee was simply not entitled to a permanent light-duty assignment.  In pertinent part, the arbitrator found that

> [t]he overriding conclusion from all of the medical evidence in the record is that there was no position for which [Lee] could meet the essential qualifications even with reasonable accommodation. Because there was not, [Defendant] had a right to discharge her.

(J.A. 217)  The district court properly reached the same conclusion.

### 2.     Fitness-for-Duty Examination

Plaintiff argues that Lee should not have been asked to take a fitness-for-duty physical examination.  In pertinent part, Lee stated:

> Question:    Now, you've claimed that you were discriminated against when you were sent for fitness for duty examination?
>
> Answer:      The union stewards said that he wasn't supposed to give me a fitness for duty.

16

| | |
|---|---|
| Question: | And do you know why they weren't supposed to do that? |
| Answer: | He told me, but I forgot. |
| . . . | |
| Answer: | Usually, they send you downtown to the Heyburn Building. |
| Question: | So you think it was discriminatory because they sent you to a different location than the usual one? |
| Answer: | You always go down to the Heyburn Building for the fitness for duty. That's number one.<br>And why -- they couldn't understand why he would be giving me a fitness for duty. He's just a post office -- a doctor that works for the post office. |
| . . . | |
| Question: | Other than that, is there any reason why you think being sent for a fitness for duty examination was discriminatory? |
| Answer: | The whole thing was discriminatory, yes, the whole ordeal, and resolving and filing this. |
| Question: | So you're saying it's the same reasons that we discussed regarding your removal? |
| Answer: | Yes. |
| Question: | So you think the fitness for duty examination was also taken in retaliation for your incident with Mr. Jewett? |
| Answer: | Yes. |

(J.A. 132-34) (formatting added). As illustrated above, Lee's allegation that her fitness-for-duty examination was discriminatory is grounded on 1) the location where the examination was conducted; and 2) her impression that it was done in retaliation for an altercation with her supervisor, Gordon Jewett ("Jewett"). Lee's arguments are meritless. First, there is no evidence on the record to support a contention that Lee's fitness-for-duty physical examination was conducted in a meaningfully or significantly different manner vis-a-vis other fitness-for-duty examinations.

Second, the examination was requested by Altic, not Jewett. (J.A. 228, 233, 236). In August 1995, Altic "did not feel [Lee's] light duty restrictions and her light duty assignment, were well

17

matched." (J.A. 226) Lee continuously "report[ed] to work late," (J.A. 227); "was not productive," (J.A. 228); and was visibly "in pain." *Id.* "Her attitude was one of wanting to do the job, but she was not able to do the job." (J.A. 228) In light of her work performance and physical condition, "the decision was made to put her in for the Fitness For Duty" examination. (J.A. 228) On August 24, 1995, Lee's supervisor requested that Lee be scheduled for a physical examination to determine her fitness-for-duty. (J.A. 183) Altic affirms that the "main reason for putting [Lee] in for the fitness for duty was that she was a hazard to herself as well as to the Postal Service," (J.A. 230), based on "the fact [that] she was falling [sic] asleep and sometimes in a dazed condition, and I would often find her with her feet upon the ledge of the case. And safety procedures on the workfloor are that you always have one foot on the floor." (J.A. 230) "[Altic] felt [she] had a responsibility to the Postal Service to report this unsafe practice, as well as a responsibility to [Lee] to see that she was not put in a position where she was likely to sustain an injury." (J.A. 231) The supervisor further clarifies that the "goal of the fitness for duty was to get a better alignment of her capabilities under her medical restrictions to her actual assigned [sic] job duties." *Id.* Altic was authorized to request a fitness-for-duty physical examination pursuant to Defendant's Employee and Labor Relations Manual, which, in pertinent part, states:

> Fitness for Duty (See Handbook El-311, 343)
> *A fitness-for-duty examination is required in determining whether an employee is able to perform the duties of the position* because of medical reasons, i.e., disability, occupational/nonoccupational injury, or illness.
>
> *Management can order fitness-for-duty examinations at any time and repeat, as necessary, to safeguard the employee or coworker. Specific reasons for the fitness-for-duty should be stated by the referring official.*

18

> A specific test or consultation may be required in the judgment of the examining medical officer. The indications will be documented as part of the report.
>
> In cases of occupational injury or illness, the Division/MSC Injury Compensation Control office may request an examination in the course of monitoring an injury compensation case. (See 547.3.)

(J.A. 180) (emphasis added). It is within Defendant's discretion and authority to request a fitness-for-duty physical examination. Indeed, the examination is required to determine whether an employee is able to perform the duties of his or her position because of medical reasons. In the instant case, Defendant set forth specific reasons for the examination. The record does not indicate that the examination was ordered for discriminatory reasons; and Plaintiff has failed to proffer any evidence that the examination was ordered for discriminatory reasons.

### 3. Removal

Lee argues that her termination was the result of discrimination based on disability. "The Rehabilitation Act forbids discrimination based on stereotypes about a handicap, but it does not forbid decisions based on the actual attributes of the handicap." *Pesterfield v. Tennessee Valley Auth.*, 941 F.2d 437, 443 (6th Cir. 1991). Defendant "may make an employment decision adverse to a handicapped person if, for example, the person's handicap causes him or her to be unable to perform an essential function of the job." *Burns v. City of Columbus, Dep't of Pub. Safety, Div. of Police*, 91 F.3d 836, 842 (6th Cir. 1996). In the instant case, as discussed above, Lee was unable to perform the essential functions of her job. Defendant has submitted a legitimate, non-discriminatory reason for Lee's termination – namely, that Lee simply could not perform the essential functions of her job, with or without accommodation, and there was no reasonable accommodation available.

19

Plaintiff proffers no evidence that the action taken by Defendant was discriminatory or based on discriminatory motives. We therefore affirm the district court's decision.

## III. Plaintiff's Racial Discrimination Claim

### A. Legal Framework

The legal framework for analyzing racial discrimination claims is similar to the legal framework used to evaluate disability discrimination claims, which is set forth above. Title VII prohibits an employer from "discharg[ing] any individual, or otherwise [ ] discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1); *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 720 (6th Cir. 2004); *see also McDonnell Douglas Corp.,* 411 U.S. at 801 ("Title VII tolerates no racial discrimination, subtle or otherwise."). "In Title VII actions, the plaintiff bears the initial burden of establishing a prima facie case of discrimination by the defendant." *Talley v. Bravo Pitino Rest., Ltd.,* 61 F.3d 1241, 1246 (6th Cir.1995) (citing *McDonnell Douglas*, 411 U.S. at 802). "A plaintiff may establish a prima facie case of discrimination either by presenting direct evidence of intentional discrimination by the defendant, or by showing the existence of circumstantial evidence which creates an inference of discrimination." *Id.* (citations omitted).

In *McDonnell Douglas*, the Supreme Court set forth the appropriate framework for reviewing claims of racial discrimination in the absence of direct evidence:

> [t]he complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for

which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

411 U.S. at 802; *Talley*, 61 F.3d at 1246. "The fourth element may also be satisfied by showing that similarly situated non-protected employees were treated more favorably." *Talley*, 61 F.3d at 1246; *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582 (6th Cir.1992). The plaintiff must proffer evidence that "for the same or similar conduct he was treated differently than similarly-situated non-minority employees." *Mitchell*, 964 F.2d at 583. A plaintiff that meets this initial burden effectively "creates a presumption that the employer unlawfully discriminated against" him. *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 254 (1981).

After an employee makes this initial showing, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the allegedly discriminatory employment action. *McDonnell Douglas,* 411 U.S. at 802. Once the defendant advances a legitimate reason for its employment action, the burden shifts back to the plaintiff "to demonstrate by competent evidence that the presumptively valid reasons for [the employment action] were in fact a coverup for a racially discriminatory decision." *Id.* at 805. This inquiry is fact-specific and intimately tied to the evidence adduced by the parties.

**B.	The District Court Properly Dismissed Plaintiff's Racial Discrimination Claim**

Plaintiff's brief to this court fails to meaningfully articulate Lee's racial discrimination claim. The brief is devoid of any support for the racial discrimination claim beyond the mere assertion that:

> In this case, Ms. Lee is African American. She was performing her light duty work capably. As set out above, there were no complaints regarding Ms. Lee's work. Ms. Lee was terminated. Pat Sauer, a

21

> white female was treated more favorably than Ms. Lee. Ms. Lee has
> demonstrated a prima facie case of racial discrimination.

(Plaintiff's Br. at 15) Mere conclusory statements regarding alleged discrimination, which are unsupported by specific facts fail to raise a genuine issued of material fact and are insufficient to survive a motion for summary judgment. *Ackerman v. Diamond Shamrock Corp.*, 670 F.2d 66, 69-70 (6th Cir. 1982). Lee simply offers no evidence or legal authority to support her racial discrimination claim. As illustrated above, Plaintiff merely alludes to Lee's alleged disparate treatment vis-a-vis a white co-worker. Lee's contention that Sauer was treated more favorably, is not supported by the record.

> With respect to Sauer, the record indicates that:

> > Sauer was a Letter Sorting Machine (LSM) Operator who suffered from a condition that rendered her unable to perform that job. Although she was provided with light duty for a period of time, her request for permanent light duty was denied. Ms. Sauer later was able to return to work, however, because she qualified for, and was the successful bidder on, a MUM clerk position. She later applied for, and was granted, disability retirement.

(J.A. 179). As illustrated above, Sauer is not similarly situated to Lee because Sauer held a different position; she was not a FSMO. Like Lee, Sauer was "provided with light duty for a period of time," *id.*, and her request for reassignment to permanent light-duty was also denied. (J.A. 181) With respect to both temporary and permanent light-duty assignments, Lee and Sauer were treated identically. Unlike Lee, however, Sauer "qualified for, and was the successful bidder on, a MUM clerk position." (J.A. 179) On the other hand, Lee did not take the typing test required for the MUM or CFS clerk positions; failed to complete the MUM Clerk training; did not bid for a permanent position; and did not otherwise pursue other employment opportunities with Defendant. Plaintiff

has simply failed to proffer evidence to support the contention that Lee's race was a motivating factor for Defendant's actions. Defendant has articulated legitimate and nondiscriminatory reasons for requiring Lee to undergo a fitness-for-duty examination and ultimately removing her. The record simply does not support Plaintiff's racial discrimination claim. We therefore affirm the district court's dismissal of this claim.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's decision.