**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 16a0441n.06

No. 15-6362

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Aug 02, 2016
DEBORAH S. HUNT, Clerk

STEPHEN H. MEADE,                          )
                                           )
    **Plaintiff-Appellant,**                )
                                           )
v.                                         )        ON APPEAL FROM THE
                                           )        UNITED STATES DISTRICT
AT&T CORPORATION,                          )        COURT FOR THE EASTERN
                                           )        DISTRICT OF KENTUCKY
    **Defendant,**                          )
                                           )
                                           )        **OPINION**
BELLSOUTH TELECOMMUNICATIONS,              )
                                           )
    **Defendant-Appellee.**                 )
                                           )

BEFORE:  GUY, BOGGS, and MOORE, Circuit Judges.

**KAREN NELSON MOORE, Circuit Judge.**  Stephen Meade worked for BellSouth Telecommunications ("BellSouth") for over thirty years.  Although he held a number of jobs over the years, his final position with the company was as a facility technician, responsible for installing and maintaining telephone and internet equipment.  In 2010, Meade learned that he had a blood clot in his leg, and his doctor suggested that he avoid climbing, being outside in the cold, and wearing boots, to avoid further complications.  As Meade admits, these limitations prevented him from continuing as a facility technician.  Initially, the limitations were temporary, so BellSouth allowed Meade to do a number of light-duty tasks around the office.  Upon learning that the limitations would be permanent, however, BellSouth refused to create a permanent light-

duty position.  Instead, it followed procedures provided by the collective-bargaining agreement applicable to Meade's job, which gave Meade a number of options for obtaining further employment with the company.  Meade declined to take advantage of all but one option, which offered him 40 weeks of termination pay and placement in a Job Bank through which he could apply for open positions within BellSouth, but he then never used the Job Bank.  Accordingly, after his termination pay ended, Meade did not obtain further employment with BellSouth.  Meade now claims that he suffered discrimination due to a disability, and that BellSouth committed the tort of intentional infliction of emotional distress.  The district court granted summary judgment to BellSouth on both counts.  We **AFFIRM**.

## I.  BACKGROUND

Meade began working for BellSouth[1] on May 23, 1977.  *See* R. 26-2 (Meade Dep. at 14:5–10) (Page ID #127).  He started as "[a]n operator," but filled a number of roles during his time with the company.  *See id.* at 14:23–15:13 (Page ID #127).  During the events relevant to this case, Meade was working as a facility technician.  *See id.* at 15:11–13 (Page ID #127).  This made him "responsible for repairing or installing telephone and internet services," R. 26-3 (Landers Decl. ¶ 5) (Page ID #163), both in the homes of BellSouth customers and also outside, when Meade would often work on utility poles, *see* R. 26-2 (Meade Dep. at 23:8–25:21) (Page

---

[1]The entity for which Meade worked is not completely clear from the record.  His deposition suggests that he worked for AT&T for his whole career, and Meade initially sued AT&T, but he later moved to substitute BellSouth Telecommunications, LLC as the defendant, asserting that Meade was never employed by AT&T.  *See* R. 21 (Mot. to Substitute at 1) (Page ID #78).  For clarity, we refer to Meade's employer as "BellSouth."

ID #128). To reach the utility poles, Meade would often need to climb ladders, *id.* at 24:25–25:21 (Page ID #128); R. 26-3 (Landers Decl. ¶¶ 10–11) (Page ID #163), and because the job involved such external repairs, Meade would have to be outside during "all types of weather," R. 26-2 (Meade Dep. at 28:14–21) (Page ID #129); R. 26-3 (Landers Decl. ¶ 12) (Page ID #163). Accordingly, the ability to work in all weather and to climb were key functions of Meade's job. *See* R. 26-2 (Meade Dep. at 29:19–31:19) (Page ID #129–30); R. 26-3 (Landers Decl. ¶¶ 4, 6–9) (Page ID #163). Facility technicians were also required to wear boots at work. *See* R. 26-2 (Meade Dep. at 31:20–32:5) (Page ID #130).

These job requirements were not an issue until August 22, 2010, when Meade discovered that he had a blood clot in his leg. *See id.* at 34:9–35:12 (Page ID #131). Meade's doctor determined that the clot had arisen "from years of climbing," *id.* at 34:19–21 (Page ID #131), and suggested that he "could no longer climb" and that he avoid being outside in cold weather or wearing boots, *see id.* at 32:13–21, 36:6–10 (Page ID #130–31). Meade obtained short-term disability benefits during this time, R. 26-3 (Landers Decl.) ¶ 14 (Page ID #164), and then returned to work on January 17, 2011 on "light-duty," *see* R. 26-2 (Meade Dep. at 36:11–37:3) (Page ID #131). This light duty consisted of "answer[ing] the phone, d[oing] some computer work, [and going] out in the field and ma[king] notes for the engineers." *Id.* at 41:8–11 (Page ID #132). The position was "not part of a formal position within BellSouth," and its creation resulted in other employees "tak[ing] more jobs to make up for the work [Meade] could not

3

perform," which necessitated sometimes the payment of overtime to those employees. R. 26-3 (Landers Decl. ¶¶ 22–24) (Page ID #165).

During 2011, Meade received periodic requests for additional medical documentation from BellSouth—apparently due to the temporary nature of the limitations his doctor had prescribed. *See id.* at 54:6–56:9 (Page ID #134). He supplied such documentation, and the temporary restrictions continued into 2012. *Id.* at 58:18–25 (Page ID #135); *see also* R. 26-3 (Landers Decl. ¶¶ 15–17) (Page ID #164). In January 2012, when Timothy Landers became Meade's supervisor, Meade faxed him a document related to Meade's ongoing light-duty restrictions, and Meade "was sent home." *Id.* at 58:18–60:18 (Page ID #135). During a telephone call that appears to have taken place around this time, Landers also made what Meade viewed as a joking reference to Meade's inability to work in cold weather, stating "[w]hat the hell is cold weather"? *See id.* at 122:2–123:21 (Page ID #149).

On February 17, 2012, BellSouth learned that Meade's restrictions would be permanent. *See* R. 26-3 (Landers Decl. ¶ 19) (Page ID #165); R. 26-2 (Meade Dep. at 71:3–72:20) (Page ID #137). Landers informed Meade that it would not be possible to create a permanent light-duty position for him, but that Meade could "continue on light duty until he had met with human resources and been fully informed of all of his options under the Permanent Medical Restrictions . . . process [of the collective-bargaining agreement]." R. 26-3 (Landers Decl. ¶ 21) (Page ID #165). During an April 9, 2012 conference call, Meade was informed of his options. *See id.* at

78:19–80:13 (Page ID #138); R. 26-4 (Thomas Decl. ¶ 3) (Page ID #174).   They were as

follows:

> (1) the Vacancies list, which had two existing vacancies for which Meade would "receive priority consideration for any . . . at or below his job title" and under which "if [Meade] selected a vacancy that paid a lower wage, his then-current salary would have been protected for 36 months";
>
> (2) the Ready Taker List, which "consists of employees, by wage scale equal to or lower than Mr. Meade, who had committed to take alternate pay to create a vacancy for a [Permanent Medical Restrictions] employee" and under which Meade's "then-current salary would have been pay protected for 36 months";
>
> (3) an Article 8.04 option, which "permitted Mr. Meade to submit two optional requests for an equal or lower level job title in his family of skills" and "was available independent of the Vacancy or Ready Taker Lists" and contained the same salary protections;
>
> (4) sabbatical or technological leaves which "would have permitted him to remain on the payroll" and "receive priority consideration for equal or lower level vacancies";
>
> (5) SIPP pay, a "voluntary payment by which he would have exited the payroll"; and
>
> (6) termination pay, which "Meade could have elected to receive . . . while participating in the Partnership Job Bank."

*See* R. 26-4 (Thomas Decl. ¶¶ 5–10) (Page ID #175–76).   This final option of termination pay

entitled Meade to 40 weeks of pay.   *Id.* ¶ 10 (Page ID #176–77).   To participate in the

Partnership Job Bank under that option, "he would need to use the Career Resource Center to bid

for jobs" and "would receive priority staffing for any job vacancies he applied for through the

Career Resource Center."   *Id.* ¶ 11 (Page ID #177).

5

Meade was provided a form to "rank jobs he desired from either the Vacancy or the Ready Taker List, as well as the two optional requests," but he did not "check any box" except the one that was necessary "to indicate his election to enter the Partnership Job Bank." *Id.* ¶ 12 (Page ID #177); R. 26-2 (Meade Dep. at 80:14–82:10) (Page ID #138–39). Meade therefore received termination pay and was "in" the Partnership Job Bank from April 22, 2012 until January 26, 2013. *See* R. 26-4 (Thomas Decl. ¶ 13) (Page ID #177).

Meade admitted that he understood at the time that his "last day on the Job Bank was going to be January 26, 2013," as that was when his 40-week termination-pay period would expire. R. 26-2 (Meade Dep. at 83:17–84:4) (Page ID #139). Nonetheless, he did not apply for any jobs during this time. R. 26-4 (Thomas Decl. ¶ 13) (Page ID #177). Meade appears to have believed that the company would contact him as vacancies became available, R. 26-2 (Meade Dep. at 85:4–25) (Page ID #139), notwithstanding the explanation he received regarding the need to use the Career Resource Center to apply for jobs in the Partnership Job Bank, R. 26-4 (Thomas Decl. ¶ 11) (Page ID #177), and Meade's admitted prior use of the Career Resource Center to apply for a position within the company, R. 26-2 (Meade Dep. at 86:10–17) (Page ID #140). Meade's termination pay and status in BellSouth's Partnership Job Bank therefore expired on January 26, 2013. *See* R. 26-2 (Meade Dep. at 112:3–10) (Page ID #146).

On February 4, 2014, Meade filed a charge of discrimination with the EEOC, claiming that he had suffered discrimination based on a disability. *See* R. 26-2 (Ex. 8 to Meade Dep.) (Page ID #156). He later filed suit against AT&T in Kentucky state court, alleging that he was

6

denied a reasonable accommodation and otherwise discriminated against because of his disability, and that AT&T's actions constituted the intentional infliction of emotional distress. *See* R. 1-1 (Compl. ¶¶ 13–20) (Page ID #10–11). After AT&T removed the action to federal court, R. 1 (Notice of Removal) (Page ID #1–4), Meade moved to substitute BellSouth as the defendant, *see* R. 21 (Mot. to Substitute at 1) (Page ID #78); R. 22 (May 22, 2015 Order at 1) (Page ID #83) (granting motion to substitute). BellSouth then moved for summary judgment on both of Meade's claims, and, on November 12, 2015, the district court granted that motion. *See* R. 41 (Nov. 12, 2015 Op.) (Page ID #326–41). This appeal followed.

## II. ANALYSIS

Meade appeals the grant of summary judgment to BellSouth on his disability-discrimination claim under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, and his claim for intentional infliction of emotional distress under Kentucky state law. We review de novo the grant of summary judgment as to each claim. *Belasco v. Warrensville Heights City Sch. Dist.*, 634 F. App'x 507, 513 (6th Cir. 2015) (citing *Keller v. Miri Microsystems LLC*, 781 F.3d 799, 806 (6th Cir. 2015). "Summary judgment is proper when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)). "In reviewing the district court's decision to grant summary judgment, we must view all evidence in the light most favorable to the nonmoving party." *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007).

No. 15-6362
*Meade v. Bellsouth Telecommunications*

## A. Disability Discrimination

"The ADA prohibits discrimination because of disability against 'a qualified individual with a disability.'" *Id.* (quoting 42 U.S.C. § 12112(a)). Discrimination under the ADA may be proven using direct or indirect evidence, *DiCarlo v. Potter*, 358 F.3d 408, 418 (6th Cir. 2004), although Meade discusses only direct evidence on appeal,[2] focusing on BellSouth's alleged denial of a reasonable accommodation, *see Kleiber*, 485 F.3d at 868 ("[C]laims premised upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence (the failure to accommodate) of discrimination.").

---

[2]Meade did not clearly raise an indirect-evidence argument before the district court, *see generally* R. 27 (Opp'n to Mot. for Summ. J.) (Page ID #187–95), although the district court analyzed the evidence and rejected any potential indirect-evidence argument in granting summary judgment to BellSouth, R. 41 (Nov. 12, 2015 Op. at 14–15) (Page ID #339–40). Meade appears not to contest this decision on appeal. To the extent that he intended to raise such an argument, it arguably appears in brief references to having been "sent home" by Landers in January 2012 and suggestions that this was an adverse employment action. *See* R. 27 (Opp'n to Mot. for Summ. J. at 7) (Page ID #193); Appellant Br. at 12–13. Even if this argument had been clearly raised before the district court and on appeal, it would fail because nothing in the record supports a finding that Meade suffered an adverse employment action. *See Belasco*, 634 F. App'x at 517 ("To make out her prima facie case, the plaintiff must demonstrate that '(1) she is disabled; (2) she was otherwise qualified for the position, with or without reasonable accommodation; (3) she suffered an adverse action; (4) the employer knew or had reason to know of her disability; and (5) she was replaced or the job remained open.'" (quoting *Rosebrough v. Buckeye Valley High Sch.*, 690 F.3d 427, 431 (6th Cir. 2012))). Meade admits that he could no longer perform the facility-technician job, so he was not qualified for it. And BellSouth followed the applicable procedures under the collective-bargaining agreement for finding a new position for an employee who suffered a permanent medical restriction. Meade's failure to take advantage of these procedures prevented him from obtaining a new position, but this does not constitute an adverse action by BellSouth.

"When an ADA plaintiff premises his claim upon direct evidence, we jettison the familiar *McDonnell Douglas* burden-shifting framework." *Kleiber*, 485 F.3d at 869. Instead, we proceed with the following analysis:

(1) The plaintiff bears the burden of establishing that he or she is disabled.

(2) The plaintiff bears the burden of establishing that he or she is "otherwise qualified" for the position despite his or her disability: (a) without accommodation from the employer; (b) with an alleged "essential" job requirement eliminated; or (c) with a proposed reasonable accommodation.

(3) The employer will bear the burden of proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon the employer.

*Id.* (quoting *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 452 (6th Cir. 2004)). This appeal turns on the second step.

Meade admits that he was no longer able to perform the essential functions of his facility-technician job due to the restrictions that he avoid climbing, being outside in the cold, and wearing boots. *See* R. 26-2 (Meade Dep. at 32:13–21, 73:13–16) (Page ID #130, 137). This admission is not necessarily fatal to his case, however, as "a 'reasonable accommodation' under the ADA may include 'reassignment to a *vacant* position.'" *Kleiber*, 485 F.3d at 869 (quoting 42 U.S.C. § 12111(9)(B)). Thus, "an employer has a duty under the ADA to consider transferring a disabled employee who can no longer perform his old job even with accommodation to a new

position within the [c]ompany for which that employee is otherwise qualified." *Id.* (alteration in original) (quoting *Burns v. Coca–Cola Enters., Inc.*, 222 F.3d 247, 257 (6th Cir. 2000)).[3]

Although Meade states that BellSouth properly accommodated him when it placed him in the temporary light-duty position in 2011, he suggests that BellSouth should have allowed him to remain in that position when his restrictions were found to be permanent in 2012. But the temporary position "was not part of a formal position within BellSouth." R. 26-3 (Landers Decl. ¶ 22) (Page ID #165). BellSouth's obligation to transfer Meade to a vacant position for which he was qualified did not require it "to create new jobs," *Kleiber*, 485 F.3d at 869 (quoting *Burns*, 222 F.3d at 257), and we have applied this rule to hold that an employer need not create a permanent light-duty position, *see Thompson v. Henderson*, 226 F. App'x 466, 474 (6th Cir. 2007) ("Defendant is simply not required to engage [its employee] in [a] temporary light-duty assignment in perpetuity."); *Brown v. Chase Brass & Copper Co.*, 14 F. App'x 482, 488 (6th Cir. 2001) ("[A]n employer has no obligation to create a permanent light duty post when none previously existed."). Furthermore, the creation of Meade's temporary light-duty position meant that other facility technicians were picking up additional repair work—because there were fewer

---

[3]BellSouth argues that Meade's reasonable-accommodation argument should fail at the outset because he appears never to have requested a specific accommodation from BellSouth. *See* Appellee Br. at 12–13. Indeed, Meade stressed during his deposition that he had not done so, R. 26-2 (Meade Dep. at 36:20–40:16, 61:25–62:3) (Page ID #131–32, 135–36), and suggested that his desire to remain indefinitely in the temporary light-duty position to which he was assigned after being injured should have been obvious, *see id.* at 62:10–13 (Page ID #136) ("Q. Did you tell him you wanted to remain on light-duty? A. I didn't see the need to. Anybody with common sense would know that."). Because we find the accommodations that Meade proposes on appeal to be unreasonable, we need not analyze whether he properly requested them in the first place.

technicians to do the same amount of work. *See* R. 26-3 (Landers Decl. ¶¶ 23–24) (Page ID #165). The ADA, however, neither requires an employer "to accommodate individuals by shifting an essential job function onto others," *Hoskins v. Oakland Cty. Sheriff's Dep't*, 227 F.3d 719, 729 (6th Cir. 2000), nor to "hire new employees to perform certain functions or duties of a disabled employee's job which the employee cannot perform by virtue of his disability," *Bratten v. SSI Servs., Inc.*, 185 F.3d 625, 632 (6th Cir. 1999). Meade's proposed permanent light-duty position, then, was not a *reasonable* accommodation.

Meade also suggests that there were other positions to which he could have been reassigned. He singles out a supply-clerk position that opened up after his limitations became permanent and during the time that he was receiving termination pay and eligible to utilize the Partnership Job Bank. *See* R. 26-2 (Meade Dep. at 112:23–114:5) (Page ID #146–47). Because that position was not vacant when Meade transitioned from the temporary light-duty position to receiving termination pay, there could not have been an obligation to transfer Meade to the position at that time. *See Kleiber*, 485 F.3d at 869 (employers need not "displace existing employees from their positions . . . in order to accommodate a disabled individual" (alteration in original) (quoting *Burns*, 222 F.3d at 257)). When the previous incumbent subsequently left that position, Meade did not "inquire about the position," R. 26-2 (Meade Dep. at 114:19–24) (Page ID #147), and the position's functions were contracted out to an external vendor, *id.* at 114:25–115:18 (Page ID #147); *see also* R. 26-5 (Vanvactor Decl. ¶ 5) (Page ID #185). BellSouth was not obligated to offer the supply-clerk position to Meade at this time, either, because it was not

"vacant"; BellSouth had decided not to hire anyone to fill the position. *See Kleiber*, 485 F.3d at 870 (explaining that no "vacancy" exists in the absence of "evidence that [the employer] continued to hire [for the position], seek out applicants, or accept applications during the relevant time period").

Nor was BellSouth obligated to contact Meade about other positions while he was receiving termination pay. Instead, BellSouth was obliged only to follow the provisions of the applicable collective-bargaining agreement regarding reassignment to a new position. *See, e.g.*, *Hedrick*, 355 F.3d at 457 ("Employers are not required to . . . violate other employees' rights under a collective bargaining agreement or other non-discriminatory policy in order to accommodate a disabled individual." (quoting *Burns*, 222 F.3d at 257)). Pursuant to that agreement, Meade had several options—including jobs for which he could have applied—yet he rejected all but one, and then did not use the Partnership Job Bank. BellSouth was not required to violate the process dictated by the collective-bargaining agreement and offer Meade jobs for which he never applied. Accordingly, the district court appropriately granted summary judgment to BellSouth on Meade's reasonable-accommodation claim because none of Meade's proposed accommodations are reasonable.

## B. Intentional Infliction of Emotional Distress

Meade also brought a claim alleging that Landers's joke regarding Meade's inability to be outside in the cold constituted intentional infliction of emotional distress. The district court granted BellSouth summary judgment on this claim, finding that the joke "is not sufficiently

outrageous to support a claim for intentional infliction of emotional distress" and that Meade did not show that he suffered sufficiently severe emotional distress. R. 41 (Nov. 12, 2015 Op. at 15–16) (Page ID #340–41). On appeal, Meade makes a brief argument that "[t]o make fun of Meade, make light of his physical[] limitations[,] and joke about his condition and his ability to work and support Meade [sic] is clearly the type of behavior that is not to be tolerated and shouldn't be rewarded in favor of the wrongdoer." Appellant Br. at 13–14. We find that the district court rightly granted summary judgment to BellSouth.

> In Kentucky, the tort of intentional infliction of emotional distress has four elements:
>
> (1) the wrongdoer's conduct must be intentional or reckless;
>
> (2) the conduct must be outrageous and intolerable in that it offends against the generally accepted standards of decency and morality;
>
> (3) there must be a causal connection between the wrongdoer's conduct and the emotional distress; and
>
> (4) the emotional distress must be severe.

*Humana of Ky., Inc. v. Seitz*, 796 S.W.2d 1, 2–3 (Ky. 1990) (quoting *Craft v. Rice*, 671 S.W.2d 247, 249 (Ky. 1984)). "Kentucky courts have recognized this tort in only the most egregious cases." *Dotson v. Wal-Mart Stores, Inc.*, No. 96-6690, 1998 WL 669940, at *1 (6th Cir. Sept. 17, 1998); *see also S.S. v. E. Ky. Univ.*, 532 F.3d 445, 459 (6th Cir. 2008) ("The cause of action for the intentional infliction of emotion[al] distress 'is intended to redress behavior that is truly outrageous, intolerable and which results in bringing one to his knees.'" (quoting *Osborne v. Payne*, 31 S.W.3d 911, 914 (Ky. 2000))).

This is not such a case. "Being demoted, criticized for work performance, passed over for promotion, and terminated pales in comparison to each of [the] instances where Kentucky courts have found recovery appropriate." *Bargo v. Goodwill Indus. of Ky., Inc.*, 969 F. Supp. 2d 819, 827 (E.D. Ky. 2013); *see also Benningfield v. Pettit Envtl., Inc.*, 183 S.W.3d 567, 572 (Ky. Ct. App. 2005) ("Mere termination clearly does not rise to the level of outrageous conduct required to support an IIED claim."), *rev. denied*, No. 2005-SC-000824-D, 2006 Ky. LEXIS 367 (Ky. Feb. 15, 2006). Even direct insults are not enough: "[L]iability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppression, or other trivialities." *Dotson*, 1998 WL 669940, at *1 (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (1965)). Meade's concern is with a single "joke" that, at most, was an inappropriate comment on his inability to work outside in the cold. But an isolated insult such as that is not sufficiently outrageous to support a claim for the intentional infliction of emotional distress. *See, e.g.*, *Humana*, 796 S.W.2d at 3–4 (even a nurse's action in informing the mother of a recently stillborn infant "that [her] baby would be disposed of in the hospital" was found to be "cold callous, and lacking sensitivity, but . . . certainly . . . not part of a pattern of conduct that 'is beyond all decency'"). Accordingly, the district court granted BellSouth summary judgment on Meade's intentional-infliction-of-emotional-distress claim.[4]

---

[4]Meade also did not set forth evidence from which a jury could find that the emotional distress he suffered was sufficiently severe. Kentucky courts have been clear that "mere embarrassment" is not enough, *Benningfield*, 183 S.W.3d at 572, and that the emotional distress must be "substantially more than mere sorrow," *Gilbert v. Barkes*, 987 S.W.2d 772, 777 (Ky. 1999). The record reflects nothing that would exceed embarrassment and sorrow, and Meade

## III.  CONCLUSION

For the foregoing reasons, we **AFFIRM** the grant of summary judgment to BellSouth.



admitted that he suffered no physical symptoms from the distress and did not seek treatment related to it.  *See* R. 26-2 (Meade Dep. at 147:21–149:7) (Page ID #152).  Accordingly, even if Landers's comment was outrageous, Meade failed to set forth a triable case that he suffered sufficiently severe emotional distress.