NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0813n.06

Case No. 15-3131

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED

Dec 11, 2015

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| NORMA BELASCO, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE |
| | ) | NORTHERN DISTRICT OF |
| WARRENSVILLE HEIGHTS CITY SCHOOL | ) | OHIO |
| DISTRICT; FELICIA WOODS-WALLACE; | ) | |
| DARLENE BUSHLEY, | ) | |
| | ) | **OPINION** |
| | ) | |
| Defendants-Appellees. | ) | |

BEFORE: BATCHELDER, GIBBONS, and WHITE, Circuit Judges.

**JULIA SMITH GIBBONS, Circuit Judge.** Norma Belasco, formerly a teacher in the Warrensville Heights (Ohio) City School District, appeals the district court's order granting summary judgment to defendants on her claims alleging discrimination on the basis of disability and violation of the Family and Medical Leave Act. We affirm the judgment of the district court.

I.

After receiving her bachelor's degree in 1959, Norma Belasco spent the majority of her career as a teacher. In 1998, the Warrensville Heights City School District ("the District") hired her as a teacher of gifted students. The next year, she took a position in Oxford, Ohio, but she returned to the District in August 2005, again as a teacher of gifted students. The District granted her a continuing contract in 2009. In 2010, Belasco was assigned to Eastwood

Elementary School. Funding cuts forced closure of the gifted program, so the District reassigned Belasco to a regular fourth-grade classroom starting in the 2011–2012 school year.

Belasco by this time had serious health problems. She had been suffering from renal failure since 2007, and before her eventual kidney transplant in April 2013, she required dialysis three times per week. She also has heart disease, had heart surgery in 2010, and has a pacemaker. Belasco says that she suffered from shortness of breath, cramps in her limbs, balance problems, and fatigue, and that she sometimes needed a walker. Her transfer to the fourth-grade classroom did not go well. Belasco concedes that her "class was not controlled properly." Hr'g Tr. 434:1–2, May 24, 2012, ECF No. 31-1. She points to three boys in her fourth-grade class, who were disruptive, she says, to the point of being "dangerous," "beyond [her] ability to deal with them." Belasco Dep. 22:2–7, July 17, 2014, ECF No. 41-1. She was "afraid that they might knock [her] down" and that she "might get hurt." Belasco Dep. 22:12–14. Felicia Woods-Wallace, principal of the school, agrees that Belasco's students were fighting frequently, at least three times a week, causing disturbances that required intervention by the principal's office. Belasco states that although she did not request a full- or part-time teacher's aide at that point, she did ask for "somebody to help [her], even if it was only two or three hours a week, just so that I would have some support." Belasco Dep. 24:23–25. Belasco also requested that one or more of the three boys be placed in a different classroom. Although the boys were occasionally suspended, they resumed their misbehavior as soon as they returned.

In a deposition, Belasco discussed the connection between her inability to manage the students and her putative disability:

> Q. Was your inability to deal with them related to your perceived disability, what you say is your disability?
>
> A. Only in that I was afraid for the children's safety, but I was also afraid that they might knock me down; I might get hurt, too.

Q. [W]as your inability to deal with the students and, as you have described it, a result of the limitations that you suffered or a result of their behaviors?

A. A result of their behavior.

Q. So when you requested assistance, you were requesting assistance to deal with their behaviors, not assistance to perform your duties as a result of the limitations that you experienced?

A. Well, they were related, obviously.

Q. How were they related?

A. As I said, my balance and things like that were not perfect, so I was a little afraid that the children would hurt each other, but also could knock me down, which has happened with teachers.

Q. Did you ever have [that] happen with you?

A. It didn't happen with me, but I was afraid.

Belasco Dep. 22:9–23:13.

At a hearing, the school security guard testified that she had to respond to Belasco's classroom as many as "four [or] five times during the day, sometimes more[,]" because "[k]ids were out of control. She couldn't deal with the kids in there." Hr'g Tr. 22:4–7. According to the security guard, on the occasions when she responded to Belasco's classroom, the students were frequently out of their seats and playing loud music, "[t]he room was filthy[,]" and the situation "was just out of control." Hr'g Tr. 22:7–8, 22:24–23:3. Similarly, the school secretary testified that she had to respond to disorder in Belasco's classroom "[e]very day"—"[s]ometimes three, four, five times a day." Hr'g Tr. 37:2–10. She described the chaotic situation:

I would go into the classroom and those kids would be out of their seats, they would be all over the place. The classroom would be a mess. They would have thrown crayons, and pencils that have been broken, books, papers. Sometimes the chairs would be turned over. The kids would rearrange the classroom to suit themselves. . . .

They would be drawing on the board, some would be working at the board. One little girl decided that she was the person who was going to run that classroom.

> She would make up lesson plans or lesson sheets for the kids to work on. She had decorated the bulletin board. Those kinds of things. . . .
>
> Sometimes they would be laying on the floor. . . . [S]ometimes they would be laying there reading, sometimes they would be playing games, sometimes just laying there because nobody could make them stay in their seat.

Hr'g Tr. 37:13–38:24. The secretary expressed her opinion that some of the students "would be just mean [to Belasco] because they could. . . . I think they took advantage of her, some of the weaknesses that they perceived in her." Hr'g Tr. 39:15–16, 40:4–6.

Around the same time, the District began to have other concerns about Belasco's job performance. One of the District's initiatives to improve students' academic performance was the "Action 100" or "100 Book Challenge" reading program, which Belasco, like all teachers, was required to implement. Darlene Bushley, the District's director of human resources, described Action 100 as "extremely critical" to the District's educational mission. Hr'g Tr. 626:20–23, June 19, 2012, ECF No. 31-3. According to Woods-Wallace, implementing Action 100 was one of the "essential functions" of every teacher's job. Hr'g Tr. 175:20–176:1, May 24, 2012, ECF No. 31-1. Defendants believed that Belasco was not implementing the program as required and was failing to record students' reading data properly in the school's database. For example, Belasco acknowledges that she entered 60 steps of reading data for students after she had been absent for five days, but she claims that she had been instructed to do so. Belasco acknowledges that she entered false data into the system; she says, however, that she did not do so intentionally but only because she "didn't know how to do it." Hr'g Tr. 495:2–7, May 30, 2012, ECF No. 31-2. Belasco says that she "was absent quite often" from training sessions and in fact "[doesn't] remember going to any sessions . . . ." Hr'g Tr. 496:18–22.

Defendants also suspected that Belasco was falsifying entries in her grade book. Woods-Wallace asked Belasco to bring in her grade book; Belasco was absent for a week and then

presented her grade book when she returned. According to defendants, "it was apparent[] that the entries were falsified." Falsification Summ. 1, ECF No. 33-24. The grades were entered arbitrarily "without reference [to] a standard, skill, worksheet or textbook pages." Mem. 1, ECF No. 33-21. Additionally, Belasco had logged grades for students on holidays when school was not in session. Belasco responds that these were entries in her personal grade book, which—as Woods-Wallace acknowledges—a teacher is free to use however she chooses as long as proper grades are entered into the school's database.

Belasco also was frequently absent from work. District records show that she was absent 26 times from August 19, 2011, when school began, to January 18, 2012, when she was placed on administrative leave. The majority of those days were listed as sick days, and several were "personal" days; two were for training sessions. Regarding tardiness, Belasco says that she does not know how many times she was absent from work, but she can recall only one time when she was late. She asserts that because she used a walker, she normally came in through the side door and went directly to her classroom, and only later went to the office to sign in. The school secretary testified that Belasco was "tardy every day." Hr'g Tr. 42:18, May 24, 2012, ECF No. 31-1. According to the secretary, although teachers were expected to be at their classroom by 8:45 a.m., Belasco consistently did not arrive at the school until 9:00 a.m. or shortly after. While waiting for Belasco to arrive, the school had to assign someone to cover her classroom—the security guard, another teacher, or sometimes the principal. The secretary also testified that for the first part of the year, Belasco did not comply with District procedures requiring teachers to provide notice of their absences using an electronic system called AESOP or a toll-free phone number.

On October 13, 2011, District superintendent Marva Jones and Woods-Wallace met with Belasco to discuss these issues. Belasco was told that by Monday, November 17, she should provide Woods-Wallace with a classroom management and discipline plan and a plan to improve her implementation of Action 100, and that she should use the automated AESOP system to report her absences. On November 21, Woods-Wallace sent Belasco a written warning expressing the administration's concerns. On December 16, 2011, Woods-Wallace sent a memo to Bushley, the HR director, documenting what she believed to be evidence that Belasco had falsified school records.

On December 19, 2011, the District held a pre-disciplinary hearing, which was attended by Belasco, Woods-Wallace, Bushley, the president of the teachers' union, and a labor relations consultant to the Ohio Education Association. Following the hearing, Belasco was directed to attend a fitness-for-duty examination, which she underwent on January 10, 2012, with a physical therapist at Marymount Hospital's Rehabilitation Services office. She failed the test: the examiner concluded that "[t]he issues of unsteady gait (with poor/fair balance) and shortness of breath would interfere with client's ability to sustain prolonged activity, to maneuver safely or to respond quickly in emergency situations, which are part of her job requirements." Physical Performance Test Results 1, ECF No. 33-7. On January 18, 2012, the District notified Belasco of its determination that she was unable to perform the essential functions of her job and unable to return to work, and the District placed her on paid administrative leave.

On February 8, 2012, Belasco informed the District that she disputed the results of the fitness-for-duty examination and intended to schedule a second examination, which she underwent on February 16, 2012, at University Hospitals. She failed it too. The examiner, a licensed occupational therapist, summarized his findings:

> The Job Description states that the teacher "Takes responsibility to ensure safety" and "Provides appropriate student supervision". Ensuring safety and providing student supervision may require quick reactions on the part of the teacher. Ms. Belasco displays poor standing balance and shortness of breath with minimally resistive tasks. She would be unable to physically respond in an appropriate way in an emergency situation. Additionally, Ms. Belasco does not meet the strength demands listed by the Dictionary of Occupational Titles.

Functional Capacity Evaluation 1, ECF No. 33-11.

On April 2, 2012, the District held a *Loudermill* hearing[1] at Belasco's request. In attendance were Belasco, District superintendent Marva Jones, and counsel for both parties. At the *Loudermill* hearing, Belasco orally requested that she receive two accommodations: the assignment of a teaching aide to her classroom and the use of a walker. Several days after the hearing, Belasco's counsel followed up with written requests for the same. The District stated that it was willing to continue to allow her the use of her walker only if her doctor could certify that using the walker would enable her to perform the essential functions of her job. The District further stated that it could not provide her a part-time teaching aide because "this is an unreasonable request for accommodation which would impose an undue hardship on the District." Accommodation Request Email Response 1, ECF No. 33-14. The District noted that the collective bargaining agreement with the teachers' union "prohibits the Board from employing part-time educational aides without the express consent of both the prospective aide and" the union, and that the union "has informed us in no uncertain terms that they will not acquiesce to the District employing part-time educational aides for any reason, including accommodation of a potentially disabled employee." Accommodation Request Email Response 1. The District further stated its belief that the ADA and Ohio law "do not require employers to accommodate employees by shifting essential work functions to others." Accommodation Request Email Response 1. Belasco states that she "vaguely" recalls requesting a part-time aide

---

[1] *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985).

on a previous occasion and being told that the District "didn't have the funding." Belasco Dep. 25:17–23.

On April 12, 2012, the District's Board of Education adopted a resolution of intent to consider the termination of Belasco's teaching contract. The Board cited three grounds for considering her termination: (1) her inability to perform the essential functions of her job; (2) her having failed two fitness-for-duty examinations; and (3) her falsification of District records. Belasco then requested a hearing before a neutral referee. The hearing took place on May 24, May 30, June 19, and July 11, 2012. The referee's findings included the following:

> (j) Whether due to one or two troublemakers or a classroom full of miscreants, there is a significant "classroom management" issue in Ms. Belasco's classroom. . . .
>
> (m) Without question, whether due to inadequate training, laziness, indifference, etc., Ms. Belasco was substantially deficient in implementing the [Action 100] program;
>
> (n) Whether due to practices learned while instructing the gifted, laziness, indifference, etc. Ms. Belasco maintained her grade records in a manner unsatisfactory to the school administration and may not have recorded them on a timely basis;
>
> (o) Ms. Belasco registered an abnormally high number of absences and an unsatisfactory number of tardies. To compound matters she declined to use the required network to report these episodes making it difficult for the District to find a substitute. When she was late, her fellow teachers or staff people had to attempt to monitor her pupils while carrying on their own duties;
>
> (p) [The fitness-for-duty examinations] identified various circumstances where Ms. Belasco's physical conditions would make it difficult for her to adequately respond to predictable happenings in a school setting[.]

Report of Referee 5–6, ECF No. 33-2. The referee recommended that the Board terminate Belasco's contract because of "substantial evidence that she is not presently fit to perform the duties of the position of Grade 4 teacher[.]" The Board terminated Belasco on July 31, 2012.

Belasco was authorized by statute to appeal the referee's decision to the Court of Common Pleas, *see* Ohio Rev. Code § 3319.16, but she declined to do so. Instead, on March 13, 2013, she filed a complaint in the Court of Common Pleas in Cuyahoga County, Ohio, against the Warrensville Heights City School District, Felicia Woods-Wallace, and Darlene Bushley (collectively, "Defendants"). Belasco alleged that defendants had discriminated against her on the basis of her disability and/or perceived disability, in violation of Ohio Rev. Code § 4112.02: she alleged that defendants had regarded her as disabled when they required her to undergo a fitness-for-work test and had subsequently terminated her when she failed the test; that defendants created a hostile work environment; and that defendants had failed to accommodate her disability. Belasco also brought a claim under the federal Family and Medical Leave Act (FMLA): she alleged that defendants had failed to reinstate her at the end of her leave and had failed to inform her of her eligibility for leave or her rights under the FMLA.[2]

Asserting that the district court had federal-question jurisdiction over Belasco's FMLA claim and supplemental jurisdiction over her state-law claim, defendants removed this action to the United States District Court for the Northern District of Ohio. After discovery, defendants moved for summary judgment, and the district court granted their motion. Belasco timely appealed.

## II.

We review *de novo* the district court's order granting summary judgment to defendants. *Keller v. Miri Microsystems LLC*, 781 F.3d 799, 806 (6th Cir. 2015). Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S.

---

[2] Belasco also brought a third claim alleging age discrimination in violation of Ohio law; she later dismissed that claim voluntarily.

317, 322 (1986). In making this assessment we view the record and all inferences drawn from it in the light most favorable to Belasco, the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is improper if the nonmoving party has produced evidence "such that a reasonable jury could return a verdict" in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The ultimate inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

III.

Because "Ohio's disability discrimination law parallels the [Americans with Disabilities Act] in all relevant respects," this court "appl[ies] the same analytical framework, using cases and regulations interpreting the ADA as guidance in our interpretation of" Ohio Rev. Code § 4112.02. *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008); *City of Columbus Civil Serv. Comm'n v. McGlone*, 697 N.E.2d 204, 206–07 (Ohio 1998).

A.

We first consider Belasco's claim that defendants failed to accommodate her disability. Under both the ADA and Ohio law, claims premised on an employer's failure to offer a reasonable accommodation necessarily involve direct evidence of discrimination. *See, e.g.*, *Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 868 (6th Cir. 2007); *Shaver v. Wolske & Blue*, 742 N.E.2d 643, 663–64 (Ohio Ct. App. 2000). Direct-evidence cases are analyzed under the following framework. First, the plaintiff bears the burden of showing that she is disabled. *Kleiber*, 485 F.3d at 869. Second, the plaintiff bears the burden of showing that she is "otherwise qualified" for the position, either without accommodation, with a proposed reasonable accommodation, or with a disputed "essential" job requirement eliminated. *Id.* Third, "[t]he employer will bear the burden of proving that a challenged job criterion is essential,

and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon the employer." *Id.*

Even if we assume that Belasco was disabled, her claim must fail. In essence, she cannot carry her burden of showing that she was able to safely and substantially perform the essential functions of her job, with or without reasonable accommodation. *See Wysong v. Dow Chem. Co.*, 503 F.3d 441, 451 (6th Cir. 2007) (citing *Hood v. Diamond Prods., Inc.*, 658 N.E.2d 738, 739 (Ohio 1996)). There is no genuine question of material fact that Belasco could not perform essential functions of her job *without* some kind of accommodation. Defendants have introduced evidence showing that in addition to Belasco's attendance problems and her deficiencies in recording grades and implementing the Action 100 program, two fitness-for-duty tests by two different examiners—one of whom she herself selected—showed that she could not perform essential functions of her job. The first examiner noted that Belasco's ability to ensure students' safety and supervise them appropriately, as required by the District's job description, would be hampered by Belasco's balance problems and shortness of breath, as observed during the test; these physical problems would interfere with her ability to sustain prolonged activity, maneuver safely, and respond in emergencies. Similarly, the second examiner found that Belasco's poor balance and shortness of breath would prevent her from responding appropriately in an emergency or from exhibiting the quick reactions that may be necessary to ensure student safety and provide student supervision. The second examiner also consulted the Dictionary of Occupational Titles for specific physical tolerances required for the job of elementary school teacher and concluded that Belasco was unable to meet the strength requirements.

Belasco asserts that the fitness-for-duty tests were improper because they were not reasonably calculated to measure the essential functions of her job. But this argument misses the

mark: in the face of the extensive evidence presented by defendants that she was unable to perform the essential functions of her job, Belasco must do more than attempt to poke holes in some of defendants' evidence. The burden is on Belasco to bring forth evidence to create a genuine issue of material fact as to whether she was able to perform the essential functions of her job. But she offers no such evidence. Indeed, given her own description of her limitations and the testimony of others, she clearly was not.

At any rate, it is not apparent that the fitness-for-duty tests were not calibrated to her job. Belasco presents the testimony of Mark Anderson, a vocational expert, who says that the District's job description "[did] not provide any specifics as far as physical tolerances on what is required," Anderson Dep. 60:14–17, Aug. 15, 2014, ECF No. 32-1, and that some of the tasks that the tests required her to perform did not correspond exactly to her job duties—climbing stairs, for example, even though the school had no stairs, or carrying a weighted crate. Belasco fails, however, to offer any evidence that the validity of the fitness-for-duty test depends on whether each element qualitatively and quantitatively corresponds exactly to narrowly defined aspects of the job in question. One might wonder, for example, how a teacher's ability to respond in emergencies could be tested if not by using other tasks as proxies for an emergency. Moreover, by arguing that "many of the tasks required by the tests" were unrelated to essential functions, Belasco implicitly concedes that at least *some* aspects of the fitness-for-duty tests *were* related to essential functions. *See* R. at 17, Appellant Br. 13–14. Belasco does not explain why her failure to pass the relevant aspects of the fitness-for-duty tests cannot independently support the examiners' conclusions that she was unable to perform essential functions of her job— namely, supervising students, ensuring their safety, and responding in emergencies. Her critique of the exams does not rebut these critical pieces of information. Belasco has failed to create a

genuine issue of material fact about whether she could perform the essential functions of her job without accommodation.

Nor has Belasco pointed to a reasonable accommodation that would have enabled her to perform the essential functions of her job. At her *Loudermill* hearing in April 2012, and again shortly after the meeting via a written request, Belasco asked for two accommodations: that she be allowed to use her walker and that she have a teacher's aide assigned to her classroom. The District agreed to allow her to use her walker if she could produce written certification from a medical professional that it would allow her to perform the essential functions of her job, but Belasco never produced such certification. Nor has Belasco explained how a walker would have allowed her to correct her other performance issues such as excessive absences and failure to properly implement the Action 100 program. Her argument that a walker would have been a reasonable accommodation thus lacks factual support.

A teacher's aide would not have been a reasonable accommodation, either. "[T]he ADA does not require employers to accommodate individuals by shifting an essential job function onto others." *Hoskins v. Oakland Cnty. Sheriff's Dep't*, 227 F.3d 719, 729 (6th Cir. 2000). Likewise, the ADA does not require employers to hire a second person to fulfill the job responsibilities ordinarily performed by one person. *Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x 974, 986 (6th Cir. 2011) (rejecting a request for a teacher's aide as unreasonable). The unreasonableness of Belasco's proposed accommodation is further illustrated by the fact, uncontroverted by Belasco, that hiring a part-time aide would have violated the District's collective bargaining agreement with the teachers' union because the union was unwilling to provide its consent. Belasco protests, however, that after she was placed on administrative leave in January 2012, the District had to bring in two substitute teachers for her classroom.

According to Belasco, the District was willing to help out a non-disabled teacher by adding a second teacher in the room but was unwilling to do the same for her because she was disabled. Defendants have introduced testimony, however, that the second substitute teacher (who was not in the classroom every day) was added not to control the classroom, which the first substitute was able to do, but solely to help the students catch up on the Action 100 program because of the unusual circumstances: they were so far behind after the semester spent with Belasco. Belasco offers no evidence to support her assertion that the first substitute teacher was provided an accommodation that should have been available to her. In sum, Belasco has not carried her burden of demonstrating that she was able to perform the essential functions of her job, with or without reasonable accommodation.

Belasco further complains that she actually requested accommodation for a disability in the fall of 2011, but the District failed to provide it. The record shows that Belasco did ask for a part-time teacher's aide and for the disruptive students to be transferred to a different classroom. But, even if she made these requests at an earlier time, they are still flawed: both actions would shift performance of essential child supervision functions onto another employee, either in Belasco's classroom or another. Any such accommodations would be unreasonable, and the District was not obligated to fulfill those requests.

Belasco also contends that defendants failed to engage in the interactive process to discuss reasonable accommodations for her alleged disability. *See* 29 C.F.R. § 1630.2(o)(3). Because Belasco did not request accommodation of a disability in fall 2011—she did not do so until her *Loudermill* hearing in April 2012—the District's duty to engage in the interactive process was not triggered until April 2012. *See Lockard v. Gen. Motors Corp.*, 52 F. App'x 782, 788 (6th Cir. 2002). And Belasco concedes that the District did engage in the interactive process

after she made her requests at and after her *Loudermill* hearing. What is more, even if the District had failed to engage in the interactive process, that failure would not be actionable because, as discussed above, Belasco has not presented sufficient evidence to reach the jury on the question of whether she could have performed the essential functions of her job with a reasonable accommodation. *EEOC v. Ford Motor Co.*, 782 F.3d 753, 766 (6th Cir. 2015) (en banc).

B.

We next consider the district court's grant of summary judgment to defendants on Belasco's claim that defendants discriminated against her on the basis of her disability when they required her to participate in fitness-for-work testing and terminated her after she failed those tests. Since this sort of discriminatory discharge claim relies on indirect evidence of animus,[3] we apply a burden-shifting framework. *See Rosebrough v. Buckeye Valley High Sch.*, 690 F.3d 427, 431 (6th Cir. 2012) (applying both Ohio and federal law). To make out her prima facie case, the plaintiff must demonstrate that "(1) she is disabled; (2) she was otherwise qualified for the position, with or without reasonable accommodation; (3) she suffered an adverse action; (4) the employer knew or had reason to know of her disability; and (5) she was replaced or the job remained open." *Id*.

Once the plaintiff establishes her prima facie case, the burden shifts to the defendant to offer a legitimate nondiscriminatory reason for the adverse employment action. *Jones v. Potter*, 488 F.3d 397, 404 (6th Cir. 2007) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). "Should the employer carry this burden, then the burden returns to the plaintiff to prove by a preponderance of the evidence that the employer's proffered reason was in fact a

---

[3] We note that Belasco does not argue that the act of examining her fitness for duty constituted discrimination; rather, she focuses on her discharge after the defendants knew the results of those tests.

pretext designed to mask illegal discrimination." *Id.* This requires the plaintiff to show "'either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate his discharge, or (3) that they were insufficient to motivate discharge.'" *Id.* at 406 (quoting *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)).

Here, Belasco's discharge claim must fail. First, she has not made out a prima facie case of disability discrimination because she cannot show that she could perform the essential functions of her job without a reasonable accommodation, and, as we explained above, she did not request any accommodation that was reasonable. Second, even if she could establish a prima facie case, she cannot show pretext. The District's stated reasons for terminating Belasco—her failure to perform the essential functions of her job, her falsification of records, and the results of her fitness-for-duty tests—have an adequate basis in fact. Even if the fitness-for-duty tests were not calibrated to measure the essential functions of her job, as Belasco contends, they could not constitute evidence of pretext without evidence showing that the District had some reason to know that the tests were not measuring the essential functions of Belasco's job, and there is no such evidence. The record simply does not support a finding that Belasco's termination was motivated by discriminatory animus. *See Jones*, 488 F.3d at 404. The district court properly granted summary judgment to defendants on Belasco's disability-discrimination claim.

## IV.

Finally, we turn to Belasco's claim under the FMLA. The FMLA guarantees 12 workweeks of unpaid leave during any 12-month period to any eligible employee who has "serious health condition that makes [her] unable to perform the functions of [her] position." 29 U.S.C. § 2612(a)(1)(D). The FMLA further guarantees an eligible employee the right to be restored by her employer to the same or equivalent position. 29 U.S.C. § 2614(a)(1). Belasco acknowledges that she never requested FMLA leave from the District when she was placed on

paid administrative leave in January 2012.  Furthermore, the District determined in March 2012 that Belasco had not worked enough hours to be eligible for FMLA leave.  Belasco argued in the district court that she had worked enough hours to be eligible but does not raise that argument again on appeal.  However, even assuming that Belasco was eligible and even assuming that the first 12 weeks of her paid administrative leave were designated as FMLA leave, Belasco cannot show that she had a right to reinstatement: as discussed above, she was unable to perform the essential functions of her job.  "[A]n employee loses the right to reinstatement '[i]f the employee is unable to perform an essential function of the position because of a physical or mental condition . . . .'" *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 516 (6th Cir. 2006) (second alteration in original) (quoting 29 C.F.R. § 825.214(b)).  Her FMLA claim therefore fails as a matter of law.

V.

For these reasons, the judgment of the district court is affirmed.