**NOT RECOMMENDED FOR PUBLICATION**
**File Name: 18a0610n.06**

**No. 18-3303**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**
Dec 04, 2018
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| MORRIS L. STANLEY, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE |
| BP PRODUCTS NORTH AMERICA, INC., aka BP-Husky Refining, LLC, | ) | NORTHERN DISTRICT OF OHIO |
| | ) | |
| Defendant-Appellee. | ) | OPINION |
| | ) | |

---

**BEFORE:** ROGERS, STRANCH, and THAPAR, Circuit Judges.

**JANE B. STRANCH, Circuit Judge.** A little less than a year after Plaintiff Morris Stanley suffered a serious stroke, he completed rehabilitation and sought to return to work. His employer, Defendant BP Products North America (BPPNA or the Company), did not allow him to do so, citing the opinions of a Company physician and Stanley's own physician indicating that he was not yet physically able to perform his duties. A year later, the Company physician cleared Stanley, and BPPNA allowed him to return to work. Stanley filed suit, claiming the delay was attributable to disability discrimination. The district court granted summary judgment to BPPNA, concluding that Stanley was not able to perform essential functions of the job at the time of the initial evaluation and that BPPNA's reliance on medical opinions was not a pretext for discrimination. Because we agree that Stanley has not demonstrated pretext, we **AFFIRM**.

## I.    BACKGROUND

Stanley has worked for BPPNA at its refinery in Oregon, Ohio since 1976.  He has never been suspended and has not received a written warning in over 20 years.  During the period at issue, Stanley was working as an operator in oil movement and storage.  His main task was lining up the product that entered the refinery to go into specific tanks.  The work required physical labor, such as lifting steam houses or climbing up a tank to check the gauges, and some driving.

While at work on November 10, 2010, Stanley had a stroke.  In its immediate aftermath, he could barely speak, had limited mobility on his right side, and had some difficulty balancing. He went on medical leave, drew short-term disability benefits, and attended speech and physical therapy classes.  By August 2012, almost two years after his stroke, he was sufficiently recovered that he was able to return to work.

This dispute centers on the year before Stanley returned to work, August 2011 to August 2012.  By July 2011, Stanley had completed rehabilitation and wished to return to work.  His short-term disability benefits had ceased a few months before.  His application for long-term disability benefits had just been denied because his treating physician had failed to supply certain documentation.

As a refinery employee, Stanley is represented by a union pursuant to a Collective Bargaining Agreement (CBA).  The portion of the CBA governing returning to work after an extended absence provides that "[a]n employee absent due to any cause for a period of ninety days or more during any continuous twelve-month period must be examined at Company expense by a doctor designated by the Company to determine whether he is capable of returning to work." Stanley avers that his primary care physician, Dr. Thomas Smallwood, told him in June 2011 that, if he passed a driving assessment, Dr. Smallwood would clear him to work without restrictions. Stanley passed the assessment and returned for a follow-up appointment on August 9.  At that visit,

he was examined by Angela Scardina, a certified nurse practitioner in Dr. Smallwood's office. Stanley told Scardina that he felt fine, apart from some difficulty with short-term memory, and Scardina performed a physical exam. Scardina reported full range of motion, good balance, strength at "five of five," and reflexes within the normal limits. The notes did not include any reference to a test of cognitive ability, aside from indicating that Stanley was alert and oriented. Scardina then filled out a form stating that Stanley could return to work on August 23, 2011.

Stanley provided the form to an assistant at BPPNA's Medical Center, where Dr. James Brue performed the Company's return-to-work examinations. Dr. Brue evaluated Stanley on August 18 and found good strength and reflexes but that Stanley had "definite issues as far as balance, coordination and loss of fine motor skills." Stanley could stand on his right leg for only one to two seconds, and he could not keep his balance during "heel-to-toe walking." Although Stanley was alert and oriented, he had difficulty with some cognitive tasks; for example, when asked to subtract 7 from 93, Stanley "was using his fingers and hands trying to count back and said it was 95." At the end of the evaluation, Dr. Brue did not give a final recommendation about whether Stanley was ready to return to work.

Following a review of Stanley's medical records, Dr. Brue concluded that Scardina failed to perform important tests and fundamentally misunderstood the requirements of Stanley's job. He sent an email to BPPNA's Human Resources division stating that Stanley could work only "in an office setting performing paperwork or simple manual tasks." When Stanley was told there was no work available with those restrictions, he filed a grievance stating that he wished to return to work.[1]

---

[1] Stanley and the union pursued this grievance for several years. In the fall of 2013, BPPNA made an offer to settle the grievance, but Stanley refused. Stanley then twice attempted to withdraw the grievance. He believes that the union accepted his second attempt, but, as of October 2016, he had been told the grievance was scheduled for arbitration. It is not clear from the record how the grievance was resolved, if at all.

The CBA describes the process to be followed if an employee disagrees with the opinion of the Company physician:

> If an employee is dissatisfied with the Company physician's opinion of the employee's physical examination, he may have his physician consult with the Company's physician in an effort to resolve the difference. Should either of the two physicians deem it necessary, they shall within 10 days call in a specialist acceptable to both physicians for further consultation and/or examination for the purpose of helping to arrive at a decision in the case.

(R. 22-1, CBA Excerpt, PageID 152) After emailing Human Resources, Dr. Brue sent Dr. Smallwood a fax stating that Stanley suffered "ongoing neurological deficits," describing the requirements of Stanley's job at the refinery, and asking "to personally discuss with [Dr. Smallwood] Mr. Stanley's ability to perform these duties." Dr. Brue followed up with calls to Dr. Smallwood's office in late October and early November but was not able to speak to him. Dr. Smallwood testified that he was unaware of Dr. Brue's attempted communications, but because his staff was responsible for answering faxes and incoming phone calls, he could not confirm "one way or the other" if his office had received the fax or calls.

The first BPPNA communication that Dr. Smallwood heard about came from Steve Rodzos, a human resources manager and the Company's "point man" on Stanley's grievance. Rodzos testified that the union chairman brought Stanley's case to his attention, asking if the Company could help because, without regular pay or long-term disability benefits, Stanley's utilities were about to be shut off. Rodzos was frustrated because he "felt like Dr. Smallwood wasn't doing what he should be doing to contact Dr. Brue, and Dr. Brue wasn't doing what he was doing [sic] to contact Dr. Smallwood." On November 1, he contacted Dr. Smallwood's office himself and told the answering receptionist that "these two doctors need to get together because Mr. Stanley is not getting paid." After the call, he expected to receive

[a] statement stating that either, A, Dr. Smallwood agreed with Dr. Brue, that Mr. Stanley could not return to work, so he could get [long-term disability], or . . . B, Dr. Brue would be swayed and agree with Dr. Smallwood that he could return to work so that he could then make his livelihood and come back and get paid.

Stanley disputes this characterization of the call, contending—with some support in the record—that Rodzos did not neutrally present the two options, but rather affirmatively sought a statement that Stanley was unable to work.

After Dr. Smallwood's assistant spoke to Rodzos, she typed up a note stating:

[Stanley] is able to return to work if a position was available with the following restrictions[:] No climbing, balancing, twisting, lifting, pushing or operating heavy machinery.  If a position such as this is unavailable, it is my professional opinion that Mr. Stanley's long term disability should be extended until he has fully regained his strength.

(R. 26-3, Smallwood Nov. 1, 2011 Note, PageID 316; R. 37, PageID 554)  Dr. Smallwood signed the note, which was faxed to BPPNA that afternoon, attention "Steve."  BPPNA did not tell Stanley about its contact with Dr. Smallwood's office or give him a copy of the note.  Dr. Smallwood's note was, however, sent to the insurer, who approved Stanley for long-term disability benefits. Stanley refused to accept any benefits for the period after August 2011, explaining that from that time he was no longer disabled and that he refused to lie about his ability to work.

Dr. Smallwood later signed a second note, this one drafted by Stanley's attorney, stating:

[A] representative from the HR Department of BP called my office and informed a medical assistant that Mr. Stanley needed a letter reinstating his restrictions as he was without funds.  This caused a letter placing restrictions on Mr. Stanley[] to be sent to BP bearing my signature dated November 1, 2011.  This writing is to make clear that there is no medical reason why Mr. Stanley cannot immediately be returned to work without restrictions.

(R. 26-1, Smallwood March 22, 2012 Note, PageID 284)  At his deposition, Dr. Smallwood identified his signature on the note and stated that he "thought it was accurate at the time [he] signed it," but he had no independent recollection of the note.  The letter is dated March 22, 2012, but Stanley admits that it was not given to BPPNA until July 2012, when a union representative

received a copy of the letter from Stanley's attorney and gave it to the Company. The reason for the delay is unclear.

In August 2012, Dr. Brue examined Stanley again, this time with a medical assistant and a union representative present. Dr. Brue reported that Stanley "was able to do a stork stand without difficulty on both the right and left leg, which is a marked improvement" and that he could "do tandem walking, heel, and toe walking without difficulty." Stanley also passed tests of cognitive ability, such as easily recalling a list of three objects "both immediately and later." Dr. Brue cleared Stanley to return to his regular duties without restrictions at the end of the exam. Stanley returned to work as an operator the following Monday and continues to work at BPPNA.

Stanley subsequently filed suit in state court, claiming disability discrimination in violation of Ohio law.[2] BPPNA removed the case to federal court on the basis of diversity of citizenship and, after discovery, moved for summary judgment. The district court held that: (1) "Stanley put[] forth no facts to demonstrate he was able to perform the essential functions of his job in August 2011 contrary to Dr. Brue and Dr. Smallwood's medical opinions," and therefore could not establish a prima facie case of disability discrimination, and (2) even if Stanley had made out a prima facie case, he did not show that BPPNA's reliance on the medical opinions was a pretext for discrimination. The court therefore granted summary judgment to BPPNA. Stanley appeals.

## II. ANALYSIS

"We review a district court's grant of summary judgment de novo and consider the facts and any inferences drawn in the light most favorable to the non-moving party." *Savage v. Fed. Express Corp.*, 856 F.3d 440, 446 (6th Cir. 2017). Summary judgment is appropriate only if "there

---

[2] Stanley also raised a claim of racial discrimination but did not pursue the claim, stating that he was unable to find a similarly situated person of a different race. The district court granted summary judgment to BPPNA on the racial discrimination claim, and Stanley does not appeal that decision.

is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

Ohio law prohibits employers from discriminating on the basis of disability. *See* Ohio Rev. Code § 4112.02(A). In evaluating disability discrimination claims, Ohio courts apply the familiar *McDonnell Douglas* burden-shifting framework. *See Jaber v. FirstMerit Corp.*, 81 N.E.3d 879, 886 (Ohio Ct. App. 2017) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). To establish a prima facie case of disability discrimination under this framework, a plaintiff must show:

> (1) that he or she was disabled; (2) that the employer took an adverse employment action against the employee, at least in part[] because the employee was disabled; and (3) that the employee could safely and substantially perform the essential functions of the job in question despite his or her disability.

*Stewart v. Bear Mgmt., Inc.*, 98 N.E.3d 900, 904 (Ohio Ct. App. 2017) (citing *Hood v. Diamond Prods.*, 658 N.E.2d 738, 741 (Ohio 1996)). Only the third element is in dispute in this case. BPPNA argues that Dr. Brue's August 2011 evaluation and Dr. Smallwood's November 2011 note prove that, during the period at issue, Stanley could not perform essential functions of his operator job. Stanley responds that Scardina's evaluation, in combination with record evidence demonstrating that Dr. Smallwood's note may not have amounted to a reasoned medical opinion, gives rise to a dispute of material fact about Stanley's abilities. We assume for purposes of argument that Stanley has demonstrated a sufficient factual dispute to establish a prima facie case.

"Once an employee establishes a prima facie case of disability discrimination, 'the burden then shifts to the employer to set forth some legitimate, nondiscriminatory reason for the action taken.' If the employer does so, 'then the employee must demonstrate that the employer's stated

reason was a pretext for impermissible discrimination.'" *Id.* at 905 (ellipsis omitted) (quoting *Hood*, 658 N.E.2d at 741–42). BPPNA argues that Stanley was not allowed to return to work in August 2011 because both the Company doctor and his personal physician refused to clear him, and the CBA requires medical clearance to return to work after an extended absence. Stanley argues that this reason is pretextual because "a reasonable trier of fact could conclude that [BPPNA] did not believe in good faith that the treating physician and its hired doctor were in agreement that Stanley was not able to safely return to work in August 2011."

We first examine the disputed period between August 2011 and August 2012 for compliance with the requirements of the CBA. When Stanley sought to return to work after his extended absence, he was promptly "examined at Company expense by a doctor designated by the Company"—here, Dr. Brue. Under the CBA, Stanley's dissatisfaction with the results of the examination entitled him to "have his physician consult with the Company's physician in an effort to resolve the difference." BPPNA took steps to achieve that consultation. Dr. Brue sent Dr. Smallwood a fax requesting a conversation about Stanley's condition; he also called Dr. Smallwood's office twice.[3] Rodzos, a Company human resources manager, also called Dr. Smallwood's office. According to the CBA, "[s]hould either of the two physicians deem it necessary, they shall within 10 days call in a specialist" to help resolve any disagreement. Neither physician made such a request, nor did Stanley himself. BPPNA therefore reasonably relied upon the note from Dr. Smallwood indicating that he agreed with Dr. Brue's assessment. BPPNA's adherence to the requirements laid out in the CBA tends to show that its reasons for not returning Stanley to work were not a pretext for disability discrimination.

---

[3] No evidence indicates that Dr. Brue did not, in fact, attempt to consult with Dr. Smallwood. A copy of the fax is in the record. Dr. Smallwood testified that he was unaware of the fax and phone calls, as he did not answer the phone or fax machine himself, but he did not state that the attempts never occurred.

Stanley cannot rebut this evidence and demonstrate pretext merely by pointing out flaws in the physicians' assessments unless he can also show that BPPNA had reason to be aware of those flaws. *See Belasco v. Warrensville Heights City Sch. Dist.*, 634 F. App'x 507, 517 (6th Cir. 2015) ("Even if the fitness-for-duty tests were not calibrated to measure the essential functions of her job, as Belasco contends, they could not constitute evidence of pretext without evidence showing that the District had some reason to know that the tests were not measuring the essential functions of Belasco's job . . . ."). It is therefore not relevant to the pretext analysis that Dr. Smallwood may have signed the November 2011 note without performing even a minimal review of Stanley's file because no evidence shows that BPPNA was aware of that omission.

Importantly, when BPPNA officials were given reason to believe that Dr. Smallwood's November 2011 note did not represent his reasoned medical opinion, they took appropriate action. In July 2012, the Company received Dr. Smallwood's second note, stating that "there is no medical reason why Mr. Stanley cannot immediately be returned to work without restrictions." The Company then facilitated a second evaluation by Dr. Brue that took place the following month. When the doctors again agreed about the appropriate course of action (this time, both clearing Stanley to return to work), BPPNA again followed their recommendation: Stanley returned to work the following Monday.

In an attempt to raise an inference that BPPNA had reason to doubt Dr. Smallwood's assessment before receiving his second note, Stanley points to Rodzos's phone call to Dr. Smallwood's office. On November 1, 2011, the same day Dr. Smallwood faxed his note indicating that Stanley could not return to work, Rodzos called the office to prod Dr. Smallwood to act on Stanley's case. There is some reason to believe that Rodzos urged Dr. Smallwood to place Stanley

on restrictions, rather than neutrally requesting action.[4] But even if such a request was made, that does not by itself put Rodzos on notice that the materials he received in response would be incorrect or otherwise unreliable. *See Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x 974, 986 (6th Cir. 2011) (explaining that an employer is generally correct to take doctors' restrictions "at face value").

Because no record evidence shows that BPPNA had any reason to disbelieve the medical opinions it relied upon, and because BPPNA promptly acted when it did receive such evidence, we find no basis in the record to conclude that the Company's reliance on medical opinions was pretextual.

### III.    CONCLUSION

For the foregoing reasons, the judgment of the district court is **AFFIRMED.**

---

[4] For example, a union representative stated in his affidavit that Rodzos said he contacted Dr. Smallwood "so that Mr. Stanley could get long term disability." Dr. Smallwood's second note stated that a human resources representative told him "that Mr. Stanley needed a letter reinstating his restrictions as he was without funds." Stanley averred that Dr. Smallwood's receptionist told him that a human resources representative "ask[ed] for a letter from Dr. Smallwood showing that [Stanley] needed to be placed on restrictions so that [he] could get on long term disability." We assume for purposes of argument that one or more of these statements does not amount to inadmissible hearsay and so can be considered at the summary judgment stage. *See Livingston Christian Schs. v. Genoa Charter Twp.*, 858 F.3d 996, 1008 (6th Cir. 2017).